IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OLUWOLE ADEGBORUWA; ENRIQUE ISONG; SYLVESTER ISONG; NGOM PRISO; ARINOLA ADEGBORUWA; ADEWOLE ADEGBORUWA; ASHLEY ROBINSON; and NYLA WATSON,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER PARTIALLY GRANTING, PARTIALLY DENYING, AND PARTIALLY DEFERRING THE ARINOLA ADEGBORUWA'S *JAMES* MOTION<br><br>Case No. 2:19-cr-00260-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

On February 16, 2021, the court granted Arinola Adegboruwa's ("Arinola") motion for a *James* hearing. ECF No. 214. The purpose of holding a *James* hearing is to determine whether the court should admit certain out of court statements made by co-conspirators as non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(E). *See United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995) (citing *United States v. James*, 590 F.2d 575 (5th Cir. 1979)). After several continuances of the hearing, the court heard oral argument on the *James* issues presented by the parties on May 23, 2023.[1]

Before the court are three questions that will determine if the Government may introduce certain statements at trial. First, whether the Government has met its burden to establish, by a preponderance of the evidence, the existence of the two separate conspiracies alleged in the Superseding Indictment. ECF No. 51. Second, whether the Defendants, Oluwole Adegboruwa

---

[1] Defendants Oluwole Adegboruwa, Adewole Adegobruwa, and Ashley Robinson joined in the motion and their counsel, together with counsel for Arinola, participated in the hearing.

("Oluwole"), Enrique Isong ("Enrique"), Sylvester Isong ("Sylvester"), Ngom Priso ("Priso"), Arinola, Adewole Adegboruwa ("Adewole"), Nyla Watson ("Watson"), and Ashley Robinson ("Robinson"), participated in these conspiracies.[2] Third, whether the Government has met its burden to establish by a preponderance of the evidence that the out of court statements it has submitted were made by the co-conspirators during and in furtherance of a conspiracy. The court concludes that the Government has successfully met its burden to establish the existence of both a money laundering and drug distribution conspiracy. It also finds that each Defendant was a member of both conspiracies. The court, however, only admits some of the out of court statements submitted by the Government for the reasons described below.

## LEGAL STANDARD

Under Fed. R. Evid. 801(d)(2)(E), "[a] statement . . . is not hearsay" if "[t]he statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, "[t]he court must determine that (1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994) (citation omitted). Because Federal Rule of Evidence 104(a) applies to *James* hearings, when considering the Government's evidence the court "is not bound by the rules of evidence

---

[2] Defendants Arinola, Watson, Robinson, and Priso have all pled guilty to charges in the Superseding Indictment. Nevertheless, the court must still decide whether they participated in the conspiracies and rule on their objections to the admissibility of individual conspirator statements because Defendants who have not changed their plea joined in the motions and arguments of these Defendants at the *James* hearing. A determination as to whether Arinola, Watson, Robinson, and Priso participated in the conspiracies and whether their statements were made in the course of and in furtherance of the conspiracies is necessary to decide the *James* motion as it relates to the remaining Defendants.

except with respect to privileges." *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995). As such, "the district court has the discretion to consider any evidence not subject to a privilege, including both the co-conspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Owens*, 70 F.3d at 1124. To find that a defendant is a conspiracy member, "there need only be some independent evidence linking the defendant to the conspiracy." *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987). "Such independent evidence may be sufficient even when it is not 'substantial.'" *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996) (quoting *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)).

## I.     EXISTENCE OF THE CONSPIRACY

To establish the existence of a conspiracy for the purposes of Rule 801(d)(2)(E), the Government must prove "that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the conspiracy; (3) Defendant knowingly and voluntarily took part in the conspiracy; and (4) the co-conspirators were interdependent." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (citation omitted).

### A. AGREEMENT

To establish each conspiracy, the Government must also show that the alleged co-conspirators agreed to commit the underlying crime. The Government need not prove an explicit agreement. Instead, the agreement "may be inferred from the facts and circumstances of the case." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992). "It is not enough, however, for the Government to show only mere association with conspirators known to be involved in crime." *Id.* (citation omitted).

### B. OBJECTIVES

Additionally, the Government must demonstrate that the "defendant shared a common purpose or design with his alleged co-conspirators." *United States v. Horn*, 946 F.2d 738, 740 (10th Cir. 1991). Although co-conspirators may be involved to greater or lesser degrees, the important question is "whether [their] activities constituted essential and integral steps toward the realization of a common, illicit goal." *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984) (quoting *United States v. Brewer,* 630 F.2d 795, 799 (10th Cir. 1980)).

### C. KNOWING AND VOLUNTARY PARTICIPATION

"A defendant may be convicted of conspiracy only if the Government proves that the defendant had knowledge of the conspiracy and voluntarily participated therein." *Evans*, 970 F.2d at 669–70. To be held liable, a co-conspirator is not required to have joined the conspiracy at its inception and, thus, know its full scale. *See United States v. Hamlin*, 986 F.2d 384, 387 (10th Cir. 1993) ("A defendant may join a conspiracy already in existence and become criminally liable for acts committed thereafter in furtherance of the scheme[.]"). Nor does a co-conspirator need to remain a part of the conspiracy until the end. *See United States v. Parnell*, 581 F.2d 1374, 1382 (10th Cir. 1978) ("The participation of each overlapped with the participation of others, . . . and this overlap . . . combined with the repeated nature of the operation which the scheme employed, are facts from which the jury could infer that appellants knew they were participating in a larger ongoing conspiracy.").

While "[a] conspirator 'need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy,'" she "must have a general awareness of both the scope and the objective of the enterprise to be regarded as a co-conspirator." *Evans*, 970 F.2d at 669–70 (quoting *United States v. Metropolitan Enters.,* 728 F.2d 444, 451 (10th Cir. 1984)). "The best way to assess a defendant's intended involvement in a conspiracy is to examine the

conspiracy from that defendant's point of view." *Id.* at 673–74. Courts should ask "[w]hat exactly did [the defendant] think she was joining?" *Id.*

### D. INTERDEPENDENCE

"[T]he conduct of the alleged co-conspirators . . . may be diverse and far-ranging, but it must be interdependent in some way." *Evans*, 970 F.2d at 670 (quoting *Horn*, 946 F.2d at 740). "Interdependence is present when 'each alleged co-conspirator . . . depend[s] on the operation of each link in the chain to achieve the common goal.'" *Id.* (alteration in original) (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)).

"[A] single conspiracy does not exist solely because many individuals deal with a common central player . . . ." *Id.* The Government cannot "string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." *Kotteakos v. United States*, 328 U.S. 750, 773 (1946). That being said, a conspiracy conviction against multiple actors is acceptable if "[a]ll knew of and joined in the overriding scheme." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). Multiple, smaller conspiracies, or "spokes," may constitute a conspiracy if these "[s]eparate spokes meeting at a common center . . . are enclosed by a *rim*." *Evans*, 970 F.2d at 670 (citation omitted).

### II.    MEMBERS OF THE CONSPIRACY

Once the court has decided that a conspiracy exists, it must also determine if alleged co-conspirators were actual members of the conspiracy. Courts apply the factors above to determine whether an individual is a conspiracy member. *See Pulido-Jacobo*, 377 F.3d at 1129. For purposes of Rule 801(d)(2)(E), an individual need not be formally charged as a conspiracy member to be considered a conspiracy member. *United States v. Durland*, 575 F.2d 1306, 1310 (10th Cir. 1978).

All that is required is that the co-conspirator meets the test's strictures by a preponderance of the evidence. *Id*.

### III.     FURTHERANCE OF THE CONSPIRACY

Finally, the court must determine whether the co-conspirator statements submitted by the Government for review were made in furtherance of the conspiracy. When conducting this inquiry, the court should "not focus on [a statement's] actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993) (quoting *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991). "[T]his determination must be made by examining the context in which the challenged statement was made." *Id*. at 1579. "A wide array of statements can fit this requirement, including those made 'to induce enlistment or further participation in the group's activities; . . . to prompt further action on the part of conspirators; . . . to reassure members of a conspiracy's continued existence; . . . to allay a co-conspirator's fears; and . . . to keep co-conspirators abreast of an ongoing conspiracy's activities.'" *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1306 (2018), *reh'g denied*, 138 S. Ct. 2670 (2018). But "mere narratives between coconspirators or narrative declarations of past events are not 'in furtherance'" of the conspiracy. *United States v. Roberts*, 14 F.3d 502, 514–15 (10th Cir. 1993).

### ANALYSIS

### I.     EXISTENCE OF CONSPIRACY AND ITS MEMBERS

The Government has alleged two different conspiracies: conspiracy to distribute oxycodone and conspiracy to commit money laundering. The court examines the Government's proffered evidence regarding each to determine whether these conspiracies existed and whether the Defendants were conspiracy members.

## A. CONSPIRACY TO DISTRIBUTE OXYCODONE

The Government alleges that each Defendant participated in a conspiracy to distribute oxycodone through the dark web. Those participating in the conspiracy allegedly shipped oxycodone and other prescription pills to customers in forty-six different states and accrued millions of dollars in revenue.

### 1. Existence of Conspiracy

To establish the existence of a conspiracy, the Government must show by the preponderance of the evidence "that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the conspiracy; (3) Defendant knowingly and voluntarily took part in the conspiracy; and (4) the co-conspirators were interdependent." *Pulido-Jacobo*, 377 F.3d at 1129. The Government has presented sufficient evidence to meet these requirements and show the existence of a conspiracy. The essential objective of the drug distribution conspiracy was to earn money by distributing oxycodone pills by mail to individuals without a valid prescription. The evidence that follows indicates that all named Defendants were members of an existing conspiracy because they were in some way involved in furthering its objectives, knew of and agreed to their role in this scheme, and relied on each other for the success of the conspiracy.

#### a. *Sales Spreadsheet and Notebooks*

The Government alleges that when Oluwole was arrested, agents recovered a USB drive with a spreadsheet entitled "Sales." That spreadsheet identified the number and type of pills shipped, the recipient, and the corresponding payment. The Government corroborated the sales data in the spreadsheet by compiling the shipping records of Oluwole and his associates and matching them to spreadsheet entries. The Government also conducted interviews, seized packages, and used surveillance to further corroborate the sales spreadsheet. The spreadsheet includes references to Defendants Enrique (referred to as "Mayo"), Sylvester (referred to as "Sly"

7

or "S"), Priso, Arinola (referred to as "Arin"), Adewole (referred to as "Dewole"), and Robinson (referred to as "Ashley"). Additionally, the Government proffers that it seized two notebooks when Oluwole was arrested. The notebooks contained drug distribution ledgers, including records of the distribution of oxycodone. The information in the two notebooks was also contained in the sales spreadsheet.

### b. Payments for Shipments

The Government has also offered evidence that the members of the conspiracy received payment for shipment of oxycodone. Evidence has been submitted that Oluwole discussed shipments of oxycodone pills with Enrique, Sylvester, Priso, Arinola, Adewole, and Robinson. Moreover, the Government has shown that Oluwole discussed paying Sylvester and Robinson for oxycodone pills and split profits from sales with Enrique. And the Government offers evidence that Oluwole and Ngom discussed the names of customers that bought oxycodone from Oluwole. These communications are corroborated by entries in the sales spreadsheet.

### c. Preparing and Shipping Packages

Next, the Government offers evidence that Defendants prepared and shipped packages containing oxycodone. First, Oluwole instructed Watson to go to Priso's residence. Shortly after this meeting, the Government alleges that Watson began preparing and shipping packages of oxycodone pills for Oluwole. The Government also shows that Oluwole sent Arinola and Watson messages including photographs of shipping labels addressed to known oxycodone customers and instructions on the quantity of oxycodone to ship to known oxycodone customers. Additionally, the Government offers evidence that Oluwole messaged Adewole to provide an amount of oxycodone and a customer name for shipment. Finally, the Government provides messages from Oluwole to Robinson instructing her to send oxycodone to known oxycodone customers.

### 2. Members of Conspiracy

The Government named all Defendants as members of the drug distribution conspiracy in its Proffer. The documents, messages, and facts above establish their membership in the conspiracy by a preponderance of the evidence.

Only one of the alleged co-conspirators, Arinola, responded to the Government's allegations in writing. In her memorandum, Arinola did not dispute any of the facts alleged in the Proffer regarding her membership in the conspiracy. ECF No. 309.

During the *James* hearing held on May 23, 2023, Defendants had another chance to object to the Government's allegations. Once more, only Arinola stated that she was not a participant in the drug distribution conspiracy for evidentiary purposes.[3] At hearing, Arinola argued that all of the statements highlighted by the Government that concerned her involvement in the conspiracy arose from a separate legitimate durable medical supplies business that she operated. But this is clearly not so. The Government provided evidence that Arinola understood her father was participating in the illegal drug trade. *See* Statement No. 130 ("Dad good morning, I had another DEA dream about you last night. Please be careful."). And it provided evidence that Arinola received several orders from her father for the packaging and shipment of illegal narcotics across the country. Additionally, Arinola's name appeared in the oxycodone sales spreadsheet. Arinola's assertion that she was not involved in the drug distribution conspiracy is simply not credible at this stage of the Government's case.

In short, the court finds that the Government has shown, by a preponderance of the evidence, that all Defendants were members of the drug distribution conspiracy.

---

[3] While the parties who joined in Arinola's motion did not contest their membership in the conspiracy for purposes of the *James* hearing, they did reserve the right to contest the existence of the conspiracy and their membership in the conspiracy at later stages of the case.

### B. CONSPIRACY TO COMMIT MONEY LAUNDERING

The Government also alleges that Defendants participated in a conspiracy to commit money laundering. Defendants allegedly hid the proceeds of their illegal drug sales through bitcoin transactions, cash deposits to personal and nominee business bank accounts, and payments to co-conspirators.

#### 1. Existence of Conspiracy

Once more, to establish the existence of a conspiracy, the Government must prove by a preponderance of the evidence "that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the conspiracy; (3) Defendant knowingly and voluntarily took part in the conspiracy; and (4) the co-conspirators were interdependent." *Pulido-Jacobo*, 377 F.3d at 1129. The Government has presented sufficient evidence to meet these requirements and show the existence of a conspiracy. The essential objective of the conspiracy was to launder drug proceeds earned from the sale of oxycodone on the dark web in order to avoid detection by law enforcement. The evidence that follows indicates that all named Defendants were members of the existing conspiracy because they were in some way involved in furthering its objectives, knew of and agreed to their role in this scheme, and relied on each other for the success of the conspiracy.

#### a. *Bitcoin Transactions*

The Government offers several pieces of evidence indicating that Oluwole made bitcoin purchases in order to launder drug proceeds. First, Oluwole met with an undercover officer ("UC") several times to purchase bitcoins. On January 31, 2019, Oluwole purchased 1.99644488 in bitcoins from a UC for $6,490 in cash. During this transaction, Oluwole advised the UC that he was able to purchase between $100,000 and $150,000 in bitcoins each week, and that his largest purchase to that date was for $450,000. On February 22, 2019, Oluwole once more met with the UC and purchased 19.90678835 in bitcoins for $74,550 in cash. On April 16, 2019, Oluwole again

10

met with the UC and purchased 15.05387559 in bitcoins for $74,150 in cash. During this final meeting, Oluwole claimed that he had recently conducted a $120,000 bitcoin purchase.

Second, the Government shows that two companies, Alpha Box Incorporated (controlled by Oluwole and Enrique) and Legers Medical Supplies and Orthotics, LLC (controlled by Oluwole), purchased bitcoins through the website localbitcoins.com. Collectively, these two companies conducted at least $93,354 in transfers in order to purchase bitcoins. Additionally, the Government alleges that Oluwole traded over 500 bitcoins in over 1,000 trades with 225 different individuals on localbitcoins.com.

Third, the Government indicates that when Oluwole was arrested on May 23, 2019, agents seized approximately $259,356 in cash, a Trezor Hard Wallet with approximately $2.35 million in cryptocurrency, and two notebooks with detailed ledgers. Agents also seized approximately $82,687 in cash and extensive handwritten notes on cryptocurrency from Oluwole's home.

Fourth, the Government proffered evidence that Robinson accompanied Oluwole on at least three occasions when he conducted bitcoin transactions and that she observed Oluwole with approximately with $5,000-$10,000 in cash on three occasions prior to Oluwole conducting bitcoin transactions. Robinson also allowed Oluwole to use her account on localbitcoins.com.

Fifth, the Government provides messages showing that Arinola and Robinson communicated with Oluwole about cryptocurrency trading accounts.

Sixth, the Government shows that Oluwole opened a Coinbase account that received approximately $1,154,801 in bitcoin and ether deposits in a ten-month span.

b.  *Cash Deposits*

The Government also offers evidence that Adewole communicated with Oluwole about numerous transactions in which Adewole facilitated cash deposits into Oluwole's bank accounts for transfer to Nigerian bank accounts. Additionally, approximately $1,155,894 in cash was

deposited into business accounts linked to Oluwole, Enrique, Arinola, and Ahsley in 2017, 2018, and 2019. The Government alleges that none of the businesses associated with these accounts filed tax returns for the years 2016, 2017, and 2018, indicating that these deposits were not legitimate.

    *c. Payments to Co-Conspirators*

Finally, the Government shows that several co-conspirators were paid using drug proceeds. Enrique and Sylvester were paid for the purchase of prescription drugs using bitcoins. The Government also proffers that Priso was paid in cash for packaging and shipping prescription drugs and that Robinson received multiple $1,550 payments from Alpha Box Incorporated. Additionally, Arinola, Robinson, and Watson received PayPal transfers from Oluwole. One of the transfers to Watson included a note that the transfer was for "Your birthday gift + money you spent on shipping," indicating that the transfer included a reimbursement for shipping packages containing prescription drugs. The Government also provides messages indicating that Robinson and Watson communicated with Oluwole about PayPal transfers.

## 2. Members of Conspiracy

The Government named all Defendants as members of the money laundering conspiracy. Only one of the alleged co-conspirators, Arinola, filed a responsive brief to the Government's Proffer. In her memorandum, Arinola did not dispute any of the facts alleged in the Proffer.

When given another opportunity to object to the Government's Proffer during the *James* hearing held on May 23, 2023, Arinola and Adewole asserted that they were not participants in the money laundering conspiracy for evidentiary purposes. All other parties conceded their involvement in the conspiracy.[4]

---

[4] While the other parties who joined in Arinola's motion did not contest their membership in the conspiracy for purposes of the *James* hearing, they also reserved the right to contest their membership and the existence of the conspiracy at later stages of this prosecution.

Arinola's objection to her membership in the money laundering conspiracy is similar to her objection to the Government's allegation that she was a member of the drug distribution conspiracy—apparently the statements highlighted by the Government all dealt with a separate legitimate durable medical supplies business. For reasons resembling those described above, the court does not find this argument credible. Arinola understood her father was participating in the illegal drug trade, and the Government also offered substantial evidence that she was an active participant in the laundering of money related to this trade through bitcoin transactions and cash deposits.

Adewole objects to his membership in the money laundering conspiracy by stating that while he may have discussed bitcoin transactions in the messages the Government submitted, the court cannot know, *with certainty*, whether these transactions were illegitimate. While it is true that there has been no determination beyond a reasonable doubt that Adewole was involved in the conspiracy, the government only has to show Adewole's involvement in the conspiracy by a preponderance of the evidence. *See Urena*, 27 F.3d at 1490. The Government more than meets this burden based upon several pieces of evidence that cumulatively establish Adewole's participation in the money laundering conspiracy. The Government has proffered that Adewole facilitated cash deposits of drug proceeds into Oluwole's bank accounts for transfer to Nigerian bank accounts, that Oluwole sent Adewole his bitcoinpostage.info username and password, and that Oluwole provided Adewole information for a drug shipment.

In short, based on the evidence set forth above, the court finds that the Government has sufficiently shown that all Defendants were members of the money laundering conspiracy.

## II.    ADMISSIBILITY OF INDIVIDUAL STATEMENTS

Once the Government establishes the existence of a conspiracy and identifies its members, the court may admit statements by co-conspirators so long as "the statements were made in the

course of and in furtherance of the conspiracy." *Urena*, 27 F.3d at 1490. The Government has submitted 3,413 statements for admission in a spreadsheet. *See* ECF No. 420. Rather than examine each of these statements individually, the court groups the statements based on the Defendants' objections. Three Defendants objected to the admissibility of certain statements; Arinola, Robinson, and Adewole.[5] Each of their objections are considered in turn.

## A. ARINOLA'S OBJECTIONS[6]

### 1. Statements not Made in Furtherance of a Conspiracy[7]

Arinola objects to the admissibly of several hundred statements submitted by the Government on grounds that they were not "made in the course of and in furtherance of the conspiracy." *Urena*, 27 F.3d at 1490. The court is inclined to admit all of these statements under Rule 801(d)(2)(E) over Arinola's objection because Arinola did not provide any explanation for *why* the statements that she objected to were unrelated to the conspiracies.

"It is the objecting party's burden to 'make its objection clear; the trial judge need not imagine all the possible grounds for an objection.'" *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 960-61 (10th Cir. 1993). A simple objection without application of facts to law is not enough to prevail in an evidentiary dispute, especially when a defendant objects to hundreds of

---

[5] Oluwole did not lodge any unique objection to the use of co-conspirator statements against him and simply joined in the objections of his co-Defendants. He did, however, request a limiting instruction for the use of third-party statements at trial. A *James* order is not the proper place to rule on this request. Oluwole will have the chance to argue for such an instruction as the court drafts jury instructions prior to trial.

[6] Arinola pled guilty to several of the charges against her on July 10, 2023. ECF No. 443. Nevertheless, the court rules on her objections because two of the remaining Defendants joined in her motion and adopted her arguments at the *James* hearing.

[7] This section corresponds with Arinola's objections numbered 1, 4, and 5 in the Government's statement spreadsheet. *See* ECF No. 420. The court did not observe a meaningful distinction between these objections.

unique statements in bulk. Here, Arinola's explanations for her objections are insufficient. Arinola marks statements in the spreadsheet that she alleges are not in furtherance of the conspiracy, but she provides no analysis of how the case law applies to any of the statements to which she objects. Tagging potentially inadmissible statements with no explanation simply does not provide enough meat for the court to sustain an evidentiary objection.

Even if Arinola had adequately developed her objections, the court would still find that the statements at issue were made in furtherance of the drug distribution or money laundering conspiracy. The vast majority of the statements that Arinola tagged as problematic were obviously linked to drug sales or money laundering. Though a few statements here and there were not visibly tied to either conspiracy at first glance, these statements provided useful context for broader conversations that were in furtherance of the conspiracies.[8] According to the Supreme Court's decision in *Bourjaily v. United States*, statements that provide context for other statements in furtherance of a conspiracy are admissible because, "[t]he sum of an evidentiary presentation may well be greater than its constituent parts." 483 U.S. 171, 180 (1987). Thus, even the Government's submitted statements that merely supported the statements in actual furtherance of the conspiracies are admissible as context. In sum, the court overrules this objection.

---

[8] For instance, Arinola objects to the admissibility of the statement "Let him continue till he leaves." Statement No. 105. This statement ultimately serves as context for a small conversation that ends with the statement that Adewole was working in Arinola's room, presumably on the drug distribution business, while Arinola was away from home. Statement Nos. 104-107. The conversation is as follows:

> Arinola: Dewole said he leaves next Friday. Should I start this week with him? Or would you rather he continues till then?
> Oluwole: Let him continue till he leaves
> Oluwole: Are you coming home today?
> Arinola: Oh okay. Yea. I was only staying at Rodney's since it's closer to the clinic and also cuz Dewole is working in my room. Rodney left town since New Year's Day

Statement Nos. 104-107.

2. **Statements by Un-Charged Individuals**[9]

The Government attempts to admit hundreds of statements by uncharged drug purchasers who messaged Oluwole over the dark web in order to buy illegal narcotics. Arinola objects to the admissibility of statements made by these individuals because drug purchasers cannot be characterized as members of the Government's proffered conspiracies. The court sustains this objection.

During the *James* hearing, the Government argued that the court should admit statements by drug purchasers under Rule 801(d)(2)(E) because all of the drug purchasers who used the conspiracies' services qualify as members of the conspiracies. According to the government, these individuals knew the purpose of the conspiracies and furthered their ends. It seeks admission on this ground even though it did not charge these individuals with participation in a conspiracy, did not proffer any independent evidence against these individuals in its memorandum, and first argued that the court should treat these individuals as co-conspirators at the hearing on May 23, 2023.

Courts may only admit a statement against a party under Rule 801(d)(2)(E) if the statement was "made by the party's co-conspirator." Fed. R. Evid. 801(d)(2)(E). Whether or not an individual is a conspiracy member for evidentiary purposes does not hinge on whether the Government has charged that individual with conspiracy to commit an illicit act. *United States v. Koch*, No. 20CR00098CMAGPG02, 2022 WL 2208793, at *2 (D. Colo. June 21, 2022) (citing *United States v. Blankenship*, 954 F. 2d 1224, 1231 (6th Cir. 1992)); *see also United States v. Durland*, 575 F.2d at 1310 ("Rule 801(d)(2)(E) of the Federal Rules of Evidence recognizes statements of co-

---

[9] This section corresponds with Arinola's objection number 2 in the statement spreadsheet. ECF No. 420.

conspirators as an exception to the prohibition against hearsay, and even though there is not a conspiracy charge, the evidence is admissible where existence of the conspiracy is independently established."). Indeed, in some circuits, the standard for determining membership during a *James* proceeding is relatively relaxed compared to the requirements the Government must reach to earn a criminal conspiracy conviction. As explained in *United States v. Trowery*,

> Conspiracy as a crime comprehends more than mere joint enterprise. It also includes other elements, such as a meeting of the minds, criminal intent and, where required by statute, an overt act. When these elements are established, the crime of conspiracy is proved.
>
> The co-conspirator exception to the hearsay rule, on the other hand, is merely a rule of evidence founded, to some extent, on concepts of agency law. It may be applied in both civil and criminal cases. . . . Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not.

542 F.2d 623, 626 (3d Cir.1976).

Though the co-conspirator category is broader in an evidentiary setting than in the criminal setting, there are limits to its reach. For instance, "[m]ere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy." *Fox*, 902 F.2d at 1514. In the Tenth Circuit, one of the hard limits to a finding of conspiracy in both the criminal *and* evidentiary context is that purchasers of drugs from a distribution conspiracy are not automatically considered members of the conspiracy. In other words, "[i]t is settled law . . . that [p]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy." *United States v. Williamson*, 53 F.3d 1500, 1518 (10th Cir. 1995) (citing *Fox*, 902 F.2d at 1514). Absent additional "evidence demonstrating that [an individual] knowingly and voluntarily joined the conspiracy and accepted the conspiratorial objectives, he cannot be transformed into a coconspirator merely because he bought drugs from a known member

of a drug conspiracy."[10] *Williamson*, 53 F.3d at 1518–19. Here, the record is devoid of any evidence supporting an inference that individual drug buyers "accepted the conspiratorial objectives" of the Defendant's conspiracy beyond their role in purchasing drugs. *Id*. Such evidence may exist for individual dark web purchasers, but the Government has not chosen to present it in its Proffer.

However, the Government did not place all its eggs in the drug conspiracy basket. It implicitly argued at the *James* hearing that the drug buyers messaging Oluwolue also participated in a money laundering conspiracy by sending cryptocurrencies to the conspiracy in exchange for illegal narcotics. But this theory of conspiracy membership also fails. For purposes of Rule 801(d)(2)(E), the Government must be able to proffer that the alleged co-conspirator "shared a common purpose or design with his alleged co-conspirators." *Horn*, 946 F.2d at 740. Here, the Government has not provided any evidence that the drug purchasers at issue had a common goal to "conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," as required for a money laundering conviction. 18 U.S.C. § 1956(a)(l). Frankly, the individuals who purchased illicit narcotics from the distribution conspiracy did not care what happened to the money they spent once it was out of their pockets. They were almost certainly ambivalent about whether the proceeds of their purchase were concealed in crypto transactions or used to purchase more drugs for distribution. Thus, the Government has failed to establish that the drug purchases were members of the Defendants' money laundering conspiracy.

---

[10] The court notes that "[i]n this circuit the buyer-seller rule . . . does not apply to defendants who plan to resell drugs for a profit." *United States v. Redifer*, 631 F. App'x 548 (10th Cir. 2015). If the Government is able to produce evidence that drug buyers in this case were involved in further distribution that dovetailed with the existing drug conspiracy, it may reconsider its ruling on this point.

In sum, the court concludes that the Government has not established that the drug purchasers at issue were members of either the drug distribution or money laundering conspiracies. Therefore, these individuals' statements are not admissible via Rule 801(d)(2)(E).

### 3. Statements Related to Conduct of Co-Conspirators Before Arinola's Participation in the Conspiracy[11]

Arinola also objects to the admissibility of statements by co-conspirators that occurred before she joined the two conspiracies. The court overrules this objection. The Tenth Circuit follows the "prevailing view among the circuits . . . that previous statements made by co-conspirators are admissible against a defendant who subsequently joins the conspiracy." *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991) (citing *United States v. Murphy*, 852 F.2d 1 (1st Cir. 1988); *United States v. Badalamenti*, 794 F.2d 821 (2d Cir. 1986); *United States v. Osgood*, 794 F.2d 1087 (5th Cir. 1986); *United States v. Balistrieri*, 778 F.2d 1226 (7th Cir. 1985); *United States v. Jackson*, 757 F.2d 1486 (4th Cir. 1985); *United States v. Leroux*, 738 F.2d 943 (8th Cir. 1984); *United States v. Jannotti*, 729 F.2d 213 (3d Cir. 1984); *United States v. Tombrello*, 666 F.2d 485 (11th Cir. 1982); *United States v. Anderson*, 532 F.2d 1218 (9th Cir. 1976)). "The fact that [a defendant] may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible." *Id.*

At the *James* hearing, Arinola argued that the court should disregard the Tenth Circuit's case law on this issue because it does not respect her due process rights. This argument is unpersuasive. The court is bound by Tenth Circuit precedent whether or not it agrees with the Circuit's reasoning. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990). Even if the court had free reign to hold that Arinola's due process rights could be negatively affected by

---

[11] This section corresponds with Arinola's objection number 3 in the statement spreadsheet. ECF No. 420.

its decision to admit statements against her that were made prior to her membership in the conspiracy, the court still would reject this argument. Arinola has offered no coherent legal theory or authority to explain how her due process rights would be impacted by the court's admission of the evidence at issue. The court, therefore, overrules Arinola's objections regarding the admissibility of statements made by her co-conspirators before she joined the conspiracy.

### B.  ROBINSON'S OBJECTIONS[12]

During the *James* hearing, Robinson introduced two objections to the admissibility of statements submitted by the Government.

First, she objected to the admissibility of statements 499 through 711 on grounds that these messages were made in a group chat and labeled as sent to or received by "Nyla WATSON, Ashley, LA Staff" in the Government's statement spreadsheet. *See* ECF No. 420. Specifically, Robinson argued that because the spreadsheet does not indicate who sent or received the messages, the court cannot find that the group chat messages were co-conspirator statements.

At the hearing, both Robinson's counsel and the Government represented that they would collaborate to determine who sent and received the messages at issue. They characterized the parties' confusion over the identity of the message sender as a solvable technical issue. Because the parties are confident that they can solve this problem, for now, the court defers ruling on the admissibility of messages sent *by* "Nyla WATSON, Ashley, LA Staff."

But the court is confident that the messages to which Robinson objects that were clearly labeled as sent *by* Oluwole *to* the group chat are admissible no matter who sent the messages labeled "Nyla WATSON, Ashley, LA Staff." For a statement to be admissible under Rule

---

[12] Robinson pled guilty to several of the charges against her on June 28, 2023. ECF No. 430. Nevertheless, the court rules on her objections because, as explained above, they are relevant to the claims of remaining Defendants who joined in her motion at the *James* hearing.

801(d)(2)(E), the Government must show that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. *See Urena*, 27 F.3d at 1490. The Rule contains no requirement that a conspirator made his statement to a co-conspirator, an identifiable person, or even a person at all, so long as they were in furtherance of the conspiracy. Because Oluwole's statements to the unknown phone were clearly intended to further the conspiracy,[13] they are admissible. Of course, any attempt to introduce Oluwole's statements *to* the phone number of unknown provenance still might face Fed. R. Evid 901 authentication issues if the parties do not resolve the technical issues pertaining to the phone. The court will be open to an objection for this reason when the parties file their motions in limine or proceed to trial.

Second, Robinson objects to statements 1507 through 2384 on grounds that these messages were either sent or received by anonymous DarkNet Market drug purchasers. As previously held, the court will not admit messages sent by online drug purchasers as co-conspirator statements because the Government has not sufficiently shown that these individuals are members of either of the charged conspiracies. This means that the messages *sent by* anonymous DarkNet users, who are all drug purchasers, are currently inadmissible. On the other hand, the messages that Oluwole sent *to* anonymous DarkNet Market users are admissible under Rule 801(d)(2)(E). Once more, courts may admit statements under Rule 801(d)(2)(E) even if they are not made to an identifiable person so long as they are in furtherance of the conspiracy. Here, the DarkNet Market messages furthered the distribution conspiracy because they transparently coordinated drug transactions. That being said, if the Government attempts to introduce Oluwole's statements to unknown

---

[13] The statements deal with payments and shipments. No party argues that they were not made in furtherance of the conspiracy.

DarkNet Market users at trial, Defendants will have the opportunity to object under Fed. R. Evid. 901 at an appropriate time.

In sum, the court overrules Robinson's objection to any statement from Oluwole, defers ruling on statements originating from the "Nyla WATSON, Ashley, LA Staff" phone number until the parties resolve the technical issues surrounding these statements, and sustains Robinson's objection to statements sent by unknown DarkNet Market users because they did not originate from co-conspirators.

### C. ADEWOLE'S OBJECTIONS

During the *James* hearing, Adewole objected to the admissibility of statements 781 through 805. He argued that it is impossible to ascertain the meaning of this series of texts, thus the court cannot find that they were made in furtherance of a conspiracy. The government proffers that these texts deal with financial transactions involving Oluwole's bank account, including cash deposits. There is sufficient evidence in the record to assume that cash deposits into Oluwole's bank account likely furthered the money laundering conspiracy. The texts also include an interaction where Adewole urges Oluwole to use WhatsApp to communicate instead of SMS messaging after Oluwole sent the message "10 E8 for Robert Everet-E." Statement Nos. 800-01. It is no stretch of the imagination to find that the first message was a drug purchase order and that Adewole sought to hide the drug conspiracy from wiretaps by convincing his father to use WhatsApp, which is encrypted, instead of SMS messaging, which is not.

Under the preponderance of the evidence standard, the court finds that statements 781 through 805 were made in furtherance of the conspiracy. Thus, they are admissible under Rule 801(d)(2)(E) and Adewole's objection is overruled.

### ORDER

For the reasons set forth above, the court HEREBY ORDERS the following:

1. The court PROVISIONALLY ADMITS the unhighlighted statements in Appendix A. In the event that the trial testimony does not support the admission of these statements, the court will consider a motion to strike and a request for curative instruction by the defense.

2. The court DEFERS ruling on the admissibility of the blue highlighted statements in Appendix A until the parties have resolved the discovery issues regarding these statements.

3. The court SUSTAINS Defendants' objection as to the orange highlighted statements in Appendix A. The court will not admit these statements at trial via Rule 801(d)(2)(E).

DATED July 12, 2023

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge